UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
MICHAEL LOUIS HENDERSON,        :
    Plaintiff,                  :
                                :
v.                              : Civil No. 3:17CV636 (AWT)
                                :
NANCY A. BERRYHILL,             :
ACTING COMMISSIONER OF SOCIAL   :
SECURITY,                       :
    Defendant.                  :
```

## ORDER REMANDING CASE

For the reasons set forth below, the decision of the Commissioner is reversed and this case is remanded for additional proceedings consistent with this order.

"A district court reviewing a final [] decision . . . [of the Commissioner of Social Security] pursuant to section 205(g) of the Social Security Act, 42 U.S.C § 405(g), is performing an appellate function." Zambrana v. Califano, 651 F.2d 842, 844 (2d Cir. 1981). The court may not make a de novo determination of whether a plaintiff is disabled in reviewing a denial of disability benefits. See Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990). Rather, the court's function is to ascertain whether the Commissioner applied the correct legal principles in reaching a conclusion and whether

the decision is supported by substantial evidence.  See Johnson
v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987).

The plaintiff argues, inter alia, that the ALJ failed to
properly weigh medical opinion evidence.  Pl.'s Mem. to Reverse
(Doc. No. 17-1) at 1.

The defendant argues that substantial evidence supports the
ALJ's Decision and the Decision is without legal error.  See
Def.'s Mem. to Affirm (Doc. No. 23-1) at 2.

The court concludes that, at minimum, the ALJ failed to
follow the treating physician rule when weighing the opinions of
the plaintiff's treating physicians, Dr. Tapas Bandypadhyay and
Dr. Sheldon Kafer, by failing to analyze all of the required
factors set forth in 20 C.F.R. § 404.1527(c) and by failing to
develop the record by making every reasonable effort to re-
contact the treating pulmonary specialist to resolve
inconsistencies and ambiguities.  This, standing alone, warrants
remand, at which time the remaining issues should also be
addressed.

"[T]he opinion of a claimant's treating physician as to
the nature and severity of the impairment is given 'controlling
weight' so long as it 'is well-supported by medically acceptable
clinical and laboratory diagnostic techniques and is not
inconsistent with the other substantial evidence in [the] case

2

record.'" Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(d)(2)).

"[I]f controlling weight is not given to the opinions of the treating physician, the ALJ . . . must specifically explain the weight that is actually given to the opinion." Schrack v. Astrue, 608 F. Supp. 2d 297, 301 (D. Conn. 2009) (citing Schupp v. Barnhart, No. Civ. 3:02CV103 (WWE), 2004 WL 1660579, at *9 (D. Conn. Mar. 12, 2004)). "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." Snell v. Apfel, 177 F.3d 128, 133-34 (2d Cir. 1999) (citing Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998)). These reasons must be stated explicitly and set forth comprehensively. See Burgin v. Asture, 348 F. App'x 646, 649 (2d Cir 2009) ("The ALJ's consideration must be explicit in the record."); Tavarez v. Barnhart, 124 F. App'x 48, 49 (2d Cir. 2005) ("We do not hesitate to remand when the Commissioner . . . do[es] not comprehensively set forth reasons for the weight assigned . . . .") (internal quotation marks and citation omitted); Reyes v. Barnhart, 226 F. Supp. 2d 523, 529 (E.D.N.Y. 2002)("rigorous and detailed" analysis required).

The ALJ's explanation should be supported by the evidence and be specific enough to make clear to the claimant and any subsequent reviewers the reasons and the weight given. See 20

3

C.F.R. § 404.1527(f)(2); SSR 96-2p (applicable but rescinded March 27, 2017, after the date of the ALJ's decision).

In determining the amount of weight to give to a medical opinion, the ALJ must consider all of the factors set forth in § 404.1527(c): the examining relationship, the treatment relationship (the length, the frequency of examination, the nature and extent), evidence in support of the medical opinion, consistency with the record, specialty in the medical field, and any other relevant factors. See Schaal, 134 F.3d at 504 ("all of the factors cited in the regulations" must be considered to avoid legal error).

> [W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history "even when the claimant is represented by counsel or . . . by a paralegal." Perez, 77 F.3d at 47; see also Pratts, 94 F.3d at 37 ("It is the rule in our circuit that 'the ALJ, unlike a judge in a trial, must [] affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding.'[. . . ].") (citations omitted).

Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999). See also Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118-19 (2d Cir. 1998) (holding that the ALJ should have sought clarifying information sua sponte because the doctor might have been able to provide a supporting medical explanation and clinical findings, that failure to include support did not mean that support did not exist, and that the doctor might have included it had he known that the ALJ would consider it dispositive).

4

> Gaps in the administrative record warrant remand . . . . Sobolewski v. Apfel, 985 F. Supp. 300, 314 (E.D.N.Y.1997); see Echevarria v. Secretary of Health & Hum. Servs., 685 F.2d 751, 755-56 (2d Cir. 1982). . . .
>
> The ALJ must request additional information from a treating physician . . . **when a medical report contains a conflict or ambiguity that must be resolved**, the report is missing necessary information, or the report does not seem to be based on medically acceptable clinical and diagnostic techniques. Id. § 404.1512(e)(1). When "an ALJ perceives **inconsistencies in a treating physician's report, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly**," Hartnett, 21 F. Supp. 2d at 221, **by making every reasonable effort to re-contact the treating source for clarification** of the reasoning of the opinion. Taylor v. Astrue, No. 07-CV-3469, 2008 WL 2437770, at *3 (E.D.N.Y. June 17, 2008).

Toribio v. Astrue, No. 06CV6532(NGG), 2009 WL 2366766, at *8-*10 (E.D.N.Y. July 31, 2009)(emphasis added)(holding that the ALJ who rejected the treating physician's opinion because it was broad, "contrary to objective medical evidence and treatment notes as a whole", and inconsistent with the state agency examiner's findings had an affirmative duty to re-contact the treating physician to obtain clarification of his opinion that plaintiff was "totally incapacitated").

In determining whether there has been "inadequate development of the record, the issue is whether the missing evidence is significant." Santiago v. Astrue, 2011 WL 4460206, at *2 (D. Conn. Sept. 27, 2011) (citing Pratts v. Chater, 94 F.3d 34, 37-38 (2d Cir. 1996)). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the

5

agency's determination." Shinseki v. Sanders, 556 U.S. 396, 409 (2009).

The ALJ's Decision states with respect to treating physicians Dr. Tapas Bandypadhyay and Dr. Sheldon Kafer:

> As for the opinion evidence, all opinions were carefully considered and weighed.
>
> . . .
>
> Dr. Bandypadhyay completed a pulmonary impairment questionnaire on September 23, 2015 (Ex. 11F, 12F). Dr. Bandypadhyay indicated that the claimant had sarcoidosis and obstructive sleep apnea (Id. at 1). He opined that the claimant's ongoing impairments were expected to last at least 12 months (Id.). Dr. Bandypadhyay indicated that the claimant could perform his work in a seated position for two hours and in a standing and/or walking position for one hour (Id. at 3). He opined that the claimant could occasionally lift and/or carry five to ten pounds (Ex. 12F at 4). Dr. Bandypadhyay's opinion is given little weight, as it is **inconsistent with the treatment notes**, which indicated that the claimant's cough had improved through treatment and his lungs were consistently clear (See Ex. 1F, 8F). There were questions as to whether the claimant had sarcoidosis or another granulomatous disease but the claimant's lymph nodes were normal, as was his skin (See Ex. 1F). Treatment notes from December of 2014 indicated that the claimant's **questionable diagnosis** of granulomatous lung disease was unlikely to be malignant (See Ex. 8F). The claimant reported experiencing sleep apnea in March of 2013 (See Ex. 1F). By June of 2013, the claimant was doing well overall and that his AHI was normal (See [i]d.). In August of 20I3, the claimant reported that he had no snoring, shortness of breath, coughing, or daytime somnolence (See [i]d.).
>
> Sheldon Kafer, M.D., a primary care physician, completed a disability impairment questionnaire on

6

December 22, 2014 (Ex. 9F, 10F). Dr. Kafer opined that the claimant's ongoing impairment would be expected to last at least 12 months (Ex. 9F at 1, 10F at 1). He indicated that the claimant could perform a job for two hours in a seated position during a normal workday day and for one hour while standing and/or walking (Id. at 3). Dr. [Kafer] opined that the claimant could only occasionally lift and/or carry five to ten pounds (Id.). He indicated that the claimant could only do occasional grasping, do fine manipulations, and reach with either upper extremity, except for right-handed grasping, which was frequent (Id. at 4). Dr. [Kafer] opined that the claimant's symptoms would likely increase in a work environment and that he would occasionally experience symptoms severe enough to interfere with work (Id.). He indicated that the claimant would need to take unscheduled breaks every three hours for 30 minutes (Id.). Dr. [Kafer] opined that the claimant would be absent more than three times a month and that the claimant suffered from anxiety, which contributed to the claimant's functional limitations (Ex. 10F at 5).

Dr. Kafer's opinion is given little weight, as it is inconsistent with the treatment notes, which indicated that the claimant's cough had improved through treatment and his lungs were consistently clear (See Ex. 1F, 8F). There were questions as to whether the claimant had sarcoidosis or another granulomatous disease but the claimant's lymph nodes were normal, as was his skin (See Ex. 1F). Treatment notes from December of 2014 indicated that the claimant questionable diagnosis of granulomatous lung disease was unlikely to be malignant (See Ex. 8F). The claimant reported experiencing sleep apnea in March of 2013 (See Ex. 1F). By June of 2013, the claimant was doing well overall and that his AHI was normal (See [i]d.). In August of 2013, the claimant reported that he had no snoring, shortness of breath, coughing, or daytime somnolence (See [i]d.). The treatment notes also showed that the claimant was alert, nontoxic, in no acute distress (See Ex. 1F, 8F).

7

R. at 34-35 (emphasis added).

In places other than the section where treating source opinions are addressed, the ALJ's Decision states the following regarding Dr. Bandyopadhyay's treatment notes:

> Treatment notes from Tapas Bandyopadhyay, M.D., who specializes in pulmonology, on March 27, 2013, indicated that the claimant was complaining of snoring (Ex. 1F at 28). Dr. Bandyopadhyay noted that the claimant's cough had improved through medication and that he had no dyspnea, wheezing, or chest pain (Id.). On physical examination, he noted that the claimant was alert and in no acute distress (Id. at 29). Dr. Bandyopadhyay observed that the claimant's throat had oropharyngeal crowding but that his lymph nodes and lungs were normal (Id.). He indicated that the claimant had obstructive sleep apnea and that he discussed the various treatment options with the claimant (Id.). On June 12, 2013, Dr. Bandyopadhyay noted that the claimant was doing well overall and that the claimant's AHI was normal in regards to his obstructive sleep apnea (Id. at 11).
>
> . . .
>
> Treatment notes from Dr. Bandyopadhyay on August 21, 2013, indicated that the claimant had no snoring, shortness of breath, coughing, or daytime somnolence (Ex. 1F at 4). He noted that the claimant was doing well overall and that his cough had improved markedly (Id.). On physical examination, Dr. Bandyopadhyay indicated that the claimant was alert and in no acute distress and had normal lung functioning (Id. at 5). He noted there was a question as to whether the claimant had sarcoidosis or another granulomatous disease, but the claimant's lymph nodes and skin were normal (Id.).
>
> Treatment notes from Dr. Bandyopadhyay on March 4, 2014, indicated that the claimant did not show up for his appointment, despite receiving a reminder telephone call (Ex. 1F at 3). Emergency room notes [from] Beverly J. Carolan, M.D., on August 29, 2014, indicated that the claimant was complaining of hiccups that had lasted for two days but had resolved while heading to the hospital (Ex. 6F at 1). Dr. Carolan noted that the claimant also complained

8

> of previous chest wall muscle pain, which was due to him
> hiccupping but had stopped (Id. at 2). On physical
> examination, she noted that the claimant was alert,
> nontoxic, and in acute distress (Id.). Dr. Carolan
> indicated that the claimant was discharged home in stable
> condition (Id. at 3). A chest x-ray from Stephen Zink,
> M.D., a radiologist, on November 25, 2014, indicated that
> the claimant's chest appeared normal and that there were no
> pulmonary nodules (Ex. 7F at 8).
>
> Treatment notes from Dr. Bandyopadhyay on December 23,
> 2014, indicated that the claimant had no complaints of
> snoring, shortness of breath, coughing, or daytime
> somnolence (Ex. 8F at 1). He indicated that the claimant
> was doing well since his last visit and that he had no
> coughing or dyspnea (Id.). On physical examination, Dr.
> Bandyopadhyay noted that the claimant was alert and in no
> acute distress (Id. at 2). He observed that the claimant's
> lymph nodes and lungs were both normal (Id.). Dr.
> Bandyopadhyay indicated that the claimant had a
> questionable diagnosis of granulomatous lung disease and
> that malignancy of this seemed unlikely (Id.).

R. at 32.

However, a review of the cited exhibits and the record as a whole raises questions as to the accuracy of the summary in the Decision.

As an initial matter, the ALJ's Decision states nothing further about Dr. Kafer's treatment notes, although there are treatment notes from May 28, 2015 that (although largely illegible) clearly make reference to sarcoidosis, as well as the record from an appointment on March 15, 2016 that lists one of the plaintiff's problems as "pulmonary sarcoidosis". R. at 50.

Also, on March 6, 2013 Dr. Bandypadhyay ordered a sleep study:

9

> The patient had absent both delta and REM sleep. Respiratory events were frequent with significant worsening in the supine position. The arousal index was elevated at 19 per hour. Almost all arousals were secondary to respiratory events. The apnea/hypopnea index for total sleep time in this portion of the sleep study was significantly elevated at 29 per hour and in the supine position was 70 per hour. Oxygen desaturation to a low of 78% was noted.

Ex. 1F/83 at R. 525. Conclusions included "Severe obstructive sleep apnea with severe oxygen desaturation."

Id.

The report from an April 16, 2013 hematology and oncology consultation was as follows:

> HISTORY OF PRESENT ILLNESS: The patient is a 60-year-old gentleman, who presented to Saint Francis Hospital with shortness of breath, coughing, hematemesis and hemoptysis. The patient has a history of peptic ulcer disease and worsening shortness of breath over the course of 2 or 3 weeks. The patient, however, has been coughing for years according to his significant other; anywhere from 5 to 10 years. She has encouraged him to have a definitive radiographic evaluation of this cough, but he has only had plain films, which were negative. The patient had apparently an episode of coffee-ground emesis and has been seen by Gastroenterology; however, EGO is on hold at this time secondary to other issues, which became evident when he had a CAT scan of the chest. Unfortunately, that CAT scan shows mediastinal adenopathy and multiple pulmonary nodules. The patient has a conglomerate of possible neoplastic lymphadenopathy in the subcarinal region that measures 4.4 cm. He also has multiple small pulmonary nodules, which are unclear as per their etiology, but could possibly be neoplastic. The patient has never smoked. He does have a paralyzed vocal cord as well.
> . . .
>
> IMPRESSION: Possible neoplastic process that could represent either pulmonary metastases or primary bronchogenic carcinoma. Patient has a paralyzed vocal cord, which is worrisome for neoplastic involvement; however, it is not entirely out of the question that

this may represent another process such as sarcoidosis. However, the most likely diagnosis is a primary neoplastic process.

Ex. 1F/46-47 at R. 488-89.

In April of 2013, the defendant was hospitalized. The Discharge Summary dated April 18, 2013 noted:

HOSPITAL COURSE:

. . .

Acute [and] chronic cough with shortness of breath. Patient was seen in consultation by Pulmonary Medicine as well as Hematology/Oncology because patient had diagnostic investigation as follows: He had a CT of the neck with contrast that showed multiple spiculated pulmonary nodules and prominent mediastinal lymphadenopathy, recommended having CT of the chest as the malignancy could not be ruled out. There is an 8-mm nodule within the right thyroid gland. Evaluation of the neck was otherwise unremarkable.

CT of the chest with contrast was done in April 15th, subsequently after the neck, that showed multiple pulmonary nodules in the right lung and diffuse adenopathy findings consistent with metastatic disease. One of the nodules could represent a primary tumor. PET scan could be useful for further evaluation. Please note that the patient was also seen in consultation by ENT Medicine in regards to his cough and his wheezing complaints. Upon evaluation by all consultants, the decision was to have a biopsy of one of the nodules and Dr. Thayer from Cardiothoracic Surgery was consulted. Patient had a mediastinoscopy done on 04/17/2013. The pathology results of which are still pending at this time. On final discharge, patient will need to follow up with Pulmonary Medicine in the next week after discharge. The working diagnosis at this time is sarcoidosis versus malignancy and we will follow up with the pathology result after the patient is discharged. Please note that the patient was also seen by ENT, who agreed with the recommendations from Pulmonary Medicine and Hematology/Oncology.

Ex. 1F/40-41 at R. 482-83.

A surgical pathology report with a surgery date of April 17, 2013 noted as to lymph node specimens:

> In specimen #1 and specimen #2, sections show nodular dense hyaline fibrosis. The pathologic findings would be compatible with an old hyalinized granuloma or granulomas. . . The etiology of the old hyalinized granuloma or granulomas is not entirely evident based on the histopatholgic findings in these sections alone. Possible etiologies are felt to include, but not be limited to, infectious granuloma(s) and sarcoid granuloma(s), among other possibilities. Clinical and imaging correlation should be considered.
>
> No carcinoma or other evidence of malignancy is identified in any of the sections examined from the present specimen.

Ex. 1F/62 at R. 504.

Dr. Bandyopadhyay's Progress Notes for a May 15, 2013 encounter state:

> The PET/CT[1] scan demonstrated intense abnormal metabolic activity in multiple lesions.
>
> There was extensive metabolically active adenopathy in the mediastinum including the paratracheal region, the subcarinal area, the AP window region, a lower right paraesophageal lesion and lesions adjacent to the aortic knob. The maximum SUV in the mediastinum was 12.3 and the largest lesion measured 3 cm. There was moderate abnormal metabolic activity in both hila regions consistent with tumor involvement.
>
> There was intense metabolic activity in multiple nodular lesions, mostly in the right lung but at least one in the left upper lobe. There was a lesion in the superior segment of the right lower lobe which measured 1.6 cm with a maximum SUV of 4.1. Just lateral to the right hilum was a 2.1 cm lesion with a maximum SUV of 5.1. There were multiple additional smaller positive nodules, primarily in the right lung.

---

[1] The results of the May 13, 2013 CT/PET scan skull base to mid-thigh may be found at Ex. 1F/74-75 at R. 516-17.

> There was abnormal metabolic activity in 2 right axillary lymph nodes, the larger measuring 1.3 cm with a maximum SUV of 2.7. There was intense uptake in 2 or 3 peripancreatic and periportal nodes in the right upper quadrant. The largest measured 1.3 cm with a maximum SUV of 4.6. There were positive left external iliac nodes and abnormal nodes in the groin regions bilaterally.
>
> There were focal bone lesions in the proximal left humeral diaphysis and in the left intertrochanteric region where the lesion measured 1.7 cm with a maximum SUV of 3.1.
>
> Impression:
>
> There were a large number of metabolically active lesions involving both lungs, primarily the right lung. One or more of the lung lesions could represent a primary and the others metastases. It is not possible to exclude the possibility that they are all metastases.
>
> There was very extensive mediastinal nodal involvement and abnormal uptake in both hilar regions.
>
> There were positive nodes in the right upper quadrant retroperitoneally as well as in the left external iliac region and in both groin regions.
>
> There were 2 probable bone metastases, as noted.

Ex. 1F/18-19 at R. 460-61.

On May 31, 2013, the plaintiff saw Dr. Pazooki for a "[c]ancer risk assessment", and the medical record states:

> **Clinical Impression and Plan** . . . .
> He had biopsy of his bilateral lung nodules. Both biopsies were negative for any malignancy such as granulomatous disease like sarcoidosis. His PET/CT as an outpatient showed lighting up mediastinal nodes and some pulmonary nodules. He had a bone scan in the hospital and CT of the abdomen and pelvis. None of those showed any lesion. I think he has sarcoidosis but we need to rule out any malignancy in his case also. I will see him back in four months with a repeat CT scan. He has been seen by Dr. John Thayer as an outpatient at the end of April 2013 and he will see him back again in July with another CT scan. If there is

13

any change in the size of the nodes, we might get another biopsy or resection for definitive diagnosis.

Ex. 1F/53 at R. 495.

The report on a July 8, 2013 CT Chest Without Contrast included the following:

> There are numerous enlarged prevascular, paratracheal, and subcarinal nodes that are nonspecific in appearance, the largest subcarinal nodal lesion measures 2.9 cm in size. The largest right paratracheal node lesion measures 2.5 cm in size.
>
> There are multiple nodules in both lungs mostly in the right lung with a few scattered small nodules in the left lung. The largest nodule measures 1.4 cc along the minor fissure in the right upper lobe.
>
> There is some peribronchial thickening and nodularity that may represent small areas of peribronchial nodal disease in the right upper lobe along central bronchi.
>
> A single nodule in the apical segment of right lower lobe demonstrates some internal cystic change, the nodule measures 14 mm in size. The largest nodule in the left lung is in the left lower lobe measuring 5 mm in size.
>
> . . .
>
> CONCLUSIONS:
> Multiple pulmonary nodules and mediastinal adenopathy essentially unchanged compared with prior study. Findings would be worrisome for a malignant, atypical infectious process, or a primary immune mediated/ inflammatory process such as sarcoidosis. Histologic evaluation is recommended.

Ex. 1F/72-73 at R. 514-515.

The contrast between what the ALJ emphasized when explaining why the treating physician's opinions were given little weight and the additional information that is in the record suggests that the Decision simply ignores evidence that does not tend to support the ultimate conclusion instead of

14

considering the record as a whole.  To avoid remand an ALJ must analyze all factors set forth in § 404.1527(c).  This includes evidence in support of the opinions of Dr. Bandyopadhyay and Dr. Kafer.  An ALJ cannot "highlight only evidence of plaintiff's improvement . . . while neglecting the overall impact of the medical record." Poczciwinski v. Colvin, 158 F. Supp. 3d 169, 176 (W.D.N.Y. 2016).  A selective recitation of the record that leaves out evidence that could support a contrary conclusion cannot be the basis for a finding that a decision is supported by substantial evidence.

Also, an ALJ cannot reject an opinion without first attempting to fill any clear gaps, to clarify any ambiguities, and to resolve inconsistencies.  Here, the ALJ relied on diagnoses ambiguity and apparent inconsistencies between the severity noted in the impairment questionnaire and the improvements noted in Dr. Bandyopadhyay's treatment notes to give less than controlling weight to his opinion as well as the opinion of Dr. Kafer, which supports that of Dr. Bandyopadhyay.  The ALJ did not seek clarification or explanation from Dr. Bandyopadhyay or Dr. Kafer, who might have been able to provide a persuasive explanation supported by clinical findings.  It is not readily apparent that improvement and non-malignancy preclude a finding that a pulmonary impairment limits a plaintiff's ability to work 8 hours a day, 5 days a week.  It is

15

for treating physicians, and not the ALJ, to make this determination, especially in a case such as this where there is evidence supported by clinical findings that the plaintiff has multiple conditions.

> Neither a reviewing judge nor the Commissioner is "permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion," Shaw, 221 F.3d at 134, or indeed for any "competent medical opinion," Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir.1998); see id. (ALJ "is not free to set his own expertise against that of a physician who [submitted an opinion to or] testified before him" or to "engage[ ] in his own evaluations of the medical findings" (internal quotation marks omitted)).

Burgess, 537 F.3d at 131.

These errors are legally significant because the ALJ might have weighed the opinions of the plaintiff's treating physicians differently, changing the outcome at Step Two and requiring the full analysis of all five steps of the sequential disability evaluation process.[2]

---

[2] At Step Two, the ALJ must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe". See 20 C.F.R. § 416.921. To establish a medically determinable impairment there must be objective medical abnormalities based on medical signs or laboratory findings, including appropriate medical test results. See 20 C.F.R. §§ 404.1528, 416.921. Signs are anatomical or physiological abnormalities which can be observed, medically described and evaluated apart from the plaintiff's statement of symptoms. See 20 C.F.R. 404.1528(b). An impairment is considered "severe" if it "significantly limits the [plaintiff's] ability to do basic work activities." 20 C.F.R. § 404.1520(c). "Basic work activities" is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). "Examples of these include . . . [p]hysical functions such as walking, standing, sitting . . . ." 20 C.F.R. § 404.1521(b)(1).

"[T]he standard for a finding of severity under Step Two of the sequential analysis is *de minimis* and is intended only to screen out

On remand the ALJ should apply the correct legal standard to the treating physicians' opinions and review the parties' arguments to address other issues as appropriate.

For the reasons set forth above, Plaintiff's Motion for Judgment on the Pleadings (Doc. No. 16) is hereby GRANTED, and Defendant's Motion for an Order Affirming the Decision of the Commissioner (Doc. No. 23) is hereby DENIED. This case is hereby REMANDED to the Commissioner for proceedings consistent with this order.

The Clerk's Office is instructed that, if any party appeals to this court the decision made after this remand, any subsequent social security appeal is to be assigned to the undersigned.

The Clerk shall close this case.

It is so ordered.

---

the very weakest cases." McIntyre v. Colvin, 758 F.3d 146, 151 (2d Cir. 2014). See also Parker-Grose v. Astrue, 462 F. App'x 16, 17 (2d Cir. 2012) (citing Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995) (citing Bowen v. Yuckert, 482 U.S. 136, 158 (1987) (O'Connor, J., concurring, joined by Stevens, J. ("'Only those [plaintiffs] with slight abnormalities that do not significantly limit **any** 'basic work activity' can be denied benefits without undertaking th[e] vocational analysis.'")) (emphasis added).

"A determination that an impairment(s) is not severe requires a careful evaluation of the medical findings which describe the impairment(s) and an informed judgment about its [] limiting effects . . . ." SSA 85-28. "Great care should be exercised in applying" this concept, and [i]f an adjudicator is unable to determine clearly the effects of an impairment . . . the sequential evaluation process should not end" at Step Two. Id.

On remand, the ALJ should apply this standard when determining the severity of the impairments at issue.

17

Dated this 18th day of September 2018, at Hartford, Connecticut.

                                                        /s/AWT
                                            Alvin W. Thompson
                                    United States District Judge